STATE of Wisconsin, Plaintiff-Respondent,

v.

Pervan Zeb SMITH, Defendant-Appellant.†

Court of Appeals

Nos. *82–377–CR, 82–891–CR, 84–1245–CR.*
*Submitted on briefs March 5, 1985.—Decided May 28, 1985.*
(Also reported in 370 N.W.2d 827.)

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

For the defendant-appellant the cause was submitted on the briefs of *Calvey, Mitchell & Baxter, S.C.,* with *Micaela Levine* of counsel, of Milwaukee.

For the plaintiff-respondent the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, with *Sally L. Wellman,* assistant attorney general, of counsel, of Madison.

Before Wedemeyer, P.J., Moser and Sullivan, JJ.

WEDEMEYER, P.J. Pervan Zeb Smith appeals from a May 4, 1984 order denying a postconviction motion which the supreme court ordered the trial court to hear in *State v. Smith,* 113 Wis. 2d 497, 335 N.W.2d 376 (1983).[1] Smith raises six claims of error: (1) a new

[1] Smith also appealed from orders of commitment and recommitment to the Department of Health & Social Services, Central State Hospital. In accord with the supreme court's mandate in *State v. Smith,* 113 Wis. 2d 497, 335 N.W.2d 376 (1983), we retained jurisdiction of the appeals from the commitment and recommitment orders, pending the trial court's decision on Smith's postconviction motion. We then granted Smith's motion to consolidate his appeal from the denial of the postconviction motion with his appeals from the commitment and recommitment orders. Smith's brief in the consolidated appeal raises no issues relating to the commitment and recommitment orders. We therefore affirm those orders.

trial should be granted based on newly discovered evidence generated by another criminal case; (2) the trial court erred in denying Smith's *Miranda-Goodchild* motion; (3) the trial court erred in denying motions to dismiss for an illegal arrest and to suppress evidence as tainted fruit of the arrest; (4) the trial court erred by instructing the jury that a defense witness was unavailable because of incompetency; (5) a new trial ought to be granted because of the state's nondisclosure of evidence; and (6) a new trial should be granted in the interest of justice.

We affirm in all respects because (1) the evidence was not newly discovered and trial counsel made a tactical decision not to use it; (2) the findings in the *Miranda-Goodchild* hearing were not clearly erroneous and supported the conclusion that Smith's waiver of his rights was intelligently made and his confession was voluntarily given; (3) sufficient exigent circumstances existed to justify the warrantless arrest of Smith in his apartment, and therefore the arrest did not taint the evidence obtained; (4) the trial court did not misuse its discretion by excluding the witness's testimony or by explaining its reasons for doing so to the jury; (5) the state did not fail to disclose evidence; and (6) a new trial in the interest of justice is unwarranted.

Smith was found not guilty by reason of mental disease or defect of the May 5, 1979, murder of Helen Lows. Details of the factual and procedural history of the case are stated in *Smith,* 113 Wis. 2d at 499–502 & n. 4, 335 N.W.2d at 377–78, and will not be repeated. Additional facts will be stated as necessary in the opinion.

## I.  NEWLY-DISCOVERED EVIDENCE

Smith claims he should have been granted a new trial based on newly discovered evidence derived from crim-

inal cases involving one David Allen Van Dyke. The new evidence is Van Dyke's conviction of several murders similar in *modus operandi,* time, and place to the Lows murder. We hold that the evidence does not meet the definition of "newly discovered" evidence.

A motion for a new trial on the ground of newly discovered evidence is addressed to the discretion of the trial court. We shall reverse only for a misuse of discretion. *State v. Boyce,* 75 Wis. 2d 452, 457, 249 N.W.2d 758, 760 (1977). The requirements for granting a new trial for newly discovered evidence are:

" '(1) The evidence must have come to the moving party's knowledge after a trial; (2) the moving party must not have been negligent in seeking to discover it; (3) the evidence must be material to the issue; (4) the testimony must not be merely cumulative to the testimony which was introduced at trial; and (5) it must be reasonably probable that a different result would be reached on a new trial.' "
If the newly discovered evidence fails to meet any one of these tests, the moving party is not entitled to a new trial. [Citations omitted.]

*Id.* at 457, 249 N.W.2d at 760–61. "Newly discovered evidence" does not include a new appreciation of the importance of evidence previously known but not used. *Vara v. State,* 56 Wis. 2d 390, 394, 202 N.W.2d 10, 12 (1972).

At the evidentiary hearing on this motion, Smith's trial counsel acknowledged prior awareness of at least four other unsolved murders which played a part in the *Van Dyke* case and which had significant similarities to the Lows murder. Counsel acknowledged making a tactical decision not to introduce this evidence at trial because it was "too scanty." Also, offering this evidence would have been inconsistent with the defense that Lows was murdered by a third party, Shelby Savage, who had

confessed to it. Counsel further admitted that even if he had been aware that Van Dyke was connected to these other murders, he still would have had to make a tactical choice. Because of counsel's tactical decision, the trial court determined that the evidence was not newly discovered. The trial court did not misuse its discretion by denying Smith's motion for a new trial.

## II.  CONFESSION

Smith next contends that his confession should have been excluded. He argues that his mental condition made it impossible for him to understand his rights and to intelligently waive them, and that therefore his confession was involuntary. We hold that the trial court's findings were not clearly erroneous and, on the basis of those findings, that Smith's waiver was intelligent and his confession voluntary.

The standard of review for this type of controversy is two-fold: "the appellate court first reviews the trial court's findings of facts to determine if they are clearly erroneous. Then the appellate court, viewing the totality of the circumstances, makes its own determination of the constitutional issue of the validity of the waivers." *State v. Woods,* 117 Wis. 2d 701, 740, 345 N.W.2d 457, 477 (1984) (Abrahamson, J., dissenting).[2] In determining voluntariness, the question to be addressed is whether the rights were waived and/or the statements were obtained under such circumstances that the defendant's actions represent his uncoerced free will, or

[2] We cite the dissent in *State v. Woods,* 117 Wis. 2d 701, 345 N.W.2d 457 (1984), only because it more succinctly expresses the standard of review. The same standard is stated in more expansive terms in the majority opinion. *See id.* at 714–16, 345 N.W.2d at 464–65.

whether the circumstances deprived him of the ability to make a rational choice. *State v. Wedgeworth,* 100 Wis. 2d 514, 524, 302 N.W.2d 810, 816 (1981). The mental condition of the accused is a relevant factor to be considered in this determination. *Norwood v. State,* 74 Wis. 2d 343, 365, 246 N.W.2d 801, 813 (1976), *cert. denied,* 430 U.S. 949 (1977).

Any conflict in the testimony regarding the circumstances surrounding the statement must be resolved in favor of the trial court's finding. The credibility of the witnesses testifying at a hearing on the voluntariness of a statement is determined by the trial court. *State v. Pires,* 55 Wis. 2d 597, 602–03, 201 N.W.2d 153, 156 (1972). " '[T]he opinion of an expert, even if uncontradicted, is not required to be accepted as such testimony must pass through the screen of the fact trier's judgment of credibility.' " *Pautz v. State,* 64 Wis. 2d 469, 476, 219 N.W.2d 327, 331 (1974) (citations omitted). "Even when the state presents no expert testimony to rebut defense expert testimony . . . , the trier of fact is not obliged to believe defense experts, at least where other evidence undercuts their opinions." *Schultz v. State,* 87 Wis. 2d 167, 173, 274 N.W.2d 614, 617 (1979).

Here, the trial court supplemented its oral decision denying the suppression motion with a memorandum setting forth the basis for its findings.[3] The memo-

---

[3] The relevant parts of the trial court's memorandum read:

Obviously the defendant's mental disease places a cloud over all the circumstances surrounding the defendant's confession. The court takes note of the factors that we may consider.

1.) The defendant is 44 years old;

2.) He apparently has a high school diploma and has taken post high school courses;

3.) There were no unusual conditions of interrogation. The defendant requested and was given cigarettes. Weapons were not

randum contains ample findings to support its conclusions of law. It is evident from the record that the findings are not clearly erroneous. A review of the

drawn, between two and four detectives were present, and the interrogation rooms were not unusually confining;

4.) The defendant confessed to both the battery and the murder within approximately two hours after the questioning was initiated;

5.) There was no physical abuse;

6.) The defendant was read his Miranda rights; and

7.) The impact of the arrest of the defendant was not substantially different from any normal police arrest.

. . . .

This court is satisfied that the defendant had prior experience with the police. He was arrested on a charge of solicitation less than one month prior to the interrogation in question. At that time it is not disputed that he was advised of his right to remain silent, and that he exercised them by specifically refusing to answer questions until he had conferred with an attorney. This experience and his statements at the time of the interrogation we are now examining satisfies the court that he knew and understood his rights, and this supports the conclusion that this experience gave him a greater power of resistance to police coercion than an inexperienced person would have had. He knew how to respond when advised of his Miranda rights, and he was able to so act in a proper fashion. That ability certainly was tempered by his mental condition, but not to the degree that it would nullify all ability to understand and act.

The psychiatric opinions all agree that the defendant could not effectively waive his rights. All but Dr. Schaefer agree that the confessions were not voluntary. Dr. Schaefer specifically stated the confessions were voluntary.

Obviously, the defendant has a long history of mental illness and was most likely ill at the time the statements were given. However, to make the assumption that mental illness results in a non-intelligent waiver and the involuntariness of the statement, under the circumstances in this question, appears to require the court to speculate.

. . . .

The police did nothing improper in questioning the defendant. The defendant did, by making the statement, what most defendants would do. First he denied any involvement, then he

memorandum leads us to conclude that the police properly administered *Miranda* warnings to Smith and that he understood the warnings, their application to his circumstances, and the consequence of their waiver.

The main thrust of Smith's argument before the trial court was that his waiver and confession were produced by acute psychosis. The trial court recognized that Smith's ability to act and respond freely was affected by his mental condition, "but not to the degree that would nullify all ability to understand and act." The trial court acknowledged the unanimous opinion of the psychiatrists that Smith could not effectively waive his rights, but nevertheless determined that an assumption that Smith's illness had resulted in a non-intelligent waiver and an involuntary statement would be speculative. In finding Smith's confession reliable, the trial court further noted that his statement was strongly corroborated by information the police had already developed. We conclude, given these circumstances, that Smith's confession was rationally and voluntarily given.

## III.   WARRANTLESS ARREST

Smith contends the trial court erred in denying his motion to dismiss the charges because his arrest was

confessed. He was advised of his rights. He did not choose to remain silent or to request a lawyer, even though he denied involvement. The defendant was fully cooperative. The first inculpatory statements were made within two hours of his arrest. The defendant had, within a month previously, exercised his Miranda rights in another situation. The defendant was coherent. His statement does reflect some psychosis but, in large part, it is strongly corroborated by the information the police already had as to the victim of the offense, the cause of death and the crimes.

Under the totality of these circumstances, this court is convinced that the statements were freely and voluntarily given and that the defendant knowingly and intelligently waived his Miranda rights prior to making those statements.

illegal. He also argues the trial court erred in refusing to suppress his statements and all physical evidence obtained as a result of the arrest because they were the fruit of the illegality. We conclude that exigent circumstances existed sufficient to justify Smith's warrantless in-home arrest.

The United States Supreme Court held in *Payton v. New York,* 445 U.S. 573 (1980), that warrantless in-home felony arrests are prohibited by the fourth amendment, absent probable cause and exigent circumstances. *Payton* explicitly refused to consider "the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." *Id.* at 583. *Payton* was expressly limited to a felony arrest. *Id.* at 576. Two years before *Payton,* the Wisconsin Supreme Court, in effect, sanctioned the warrantless entry of a dwelling to arrest a felon on probable cause, given exigent circumstances. *See Laasch v. State,* 84 Wis. 2d 587, 595–96, 267 N.W.2d 278, 283–84 (1978).

The United States Supreme Court granted certiorari in *Welsh v. Wisconsin,* 80 L. Ed. 2d 732 (1984), to decide "whether, and if so under what circumstances, the Fourth Amendment prohibits the police from making a warrantless night entry of a person's home in order to arrest him for violation of a nonjailable traffic offense." *Id.* at 738. The Court concluded that because "there were no exigent circumstances to justify a warrantless home entry," it would leave unanswered the question "whether the Fourth Amendment may impose an absolute ban on warrantless home arrests for certain minor offenses." *Id.* at 743 n. 11. Thus, no authority prohibits the extension of *Laasch* to an in-home warrantless arrest of a misdemeanant, given the presence of exigent circumstances.

*Welsh* concluded that *Payton* left to the lower courts the initial, albeit infrequent, application of the exigent-circumstances exception. *See id.* at 743. In expressing its hesitancy to find the existence of any exigency, the Supreme Court stressed the importance of focusing on the nature of the underlying offense. *Id.* at 745. Although it opined that the application of the exception "in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense" occurred, *id.,* it acknowledged that other courts had found justifiable exigencies independent of the gravity of the underlying offense. *Id.* at 744. *Welsh* therefore adopted a "commonsense approach." *Id.* at 745. We conclude that such an approach requires an examination of all of the circumstances surrounding the entry and arrest. The test ought not be quantitative, but rather, qualitative.[4]

Smith argues that the facts attendant to the misdemeanor battery charge do not demonstrate the existence of exigent circumstances justifying a warrantless entry into his home. We disagree.

The trial court's conclusion that exigent circumstances existed sufficient to justify the warrantless entry was based on the following findings. Police arrested Smith for a misdemeanor battery. The incident prompting the arrest was not a typical battery, however. It involved a physically strong, forty-four-year-old male attacking an eighty-six-year-old woman in her home after she refused his request for sexual intercourse. He beat her around the head until she fought him off with a flashlight. There was a strong evidentiary link between the battery and the subsequently discovered battery-murder of the

---

[4] Thus the legislature's classification of the offense ought not be the only determining factor.

same woman. The circumstantial similarity between the battery and the murder gave the officers grounds for a reasonable suspicion, although not probable cause, that Smith committed the murder. The trial court found that since the police had reason to believe that Smith was involved in the murder, in which the assailant used a knife and a claw hammer, it was reasonable for them to assume that he might be armed with a dangerous weapon.

In order to locate Smith, the investigating officers made a broad inquiry at places he frequented and of people he knew. The trial court found that it therefore was reasonable for the police to believe that someone might inform Smith of their investigation and that he might flee. The court found that the likelihood of escape was present. The entry occurred at 8:30 p.m. on a Monday evening, a reasonable hour at which time most people are home, but a difficult time to obtain a warrant. The trial court deemed the circumstances sufficiently exigent to justify a warrantless entry and arrest of Smith in his apartment.

For the purposes of the pretrial motion to dismiss and suppress, the state's chief witnesses were police detectives William Matson and Lawrence Jordan. The uncontroverted testimony of Matson and Jordan reveals the following sequence of events on the day of the arrest. The two detectives were assigned to investigate the battery complaint as a followup to the investigation of the murder. Matson had previously spent two days investigating the murder.

Both officers knew that a laundry tag had been recovered from a sport coat left in Lows' residence by the suspect in the battery. The source of the tag had been identified as one of two laundries, both owned by Nash Cleaners. Lows' residence was the site of both the battery and the murder. Jordan believed the two were in some way connected. He concluded that, at least in a collective sense, he was participating in a murder inves-

tigation. When he went to Nash Cleaners to ascertain who owned the coat, he felt that the same person might be the murderer.

The owner of the cleaners told him that the tag came from her laundry, and that one of the names on the tag was hers and the other should be the person who brought the coat to the laundry. She corroborated this by checking the complete laundry slip that she kept on file. The name of Pervan Smith appeared on the slip. Mrs. Nash gave Smith's last known address to Jordan.

Jordan then returned to the police administration building and checked the Bureau of Identification (B of I) files for Smith's address. He did not obtain a warrant and did not know whether one existed. Jordan and Matson then went to the address they had obtained. They interviewed several people who lived in the building and learned that Smith had moved out several days before. The caretaker of the building told Jordan to check a restaurant called "Lil's," where Smith often ate his meals.

Jordan had also obtained from the B of I an address for Smith's brother, but upon visiting this address, found it was only a vacant lot. Next, Jordan visited Lil's Restaurant to speak to Lil, but learned from the cook that she was not there. He also made a general inquiry of the cook about Smith. He and Matson then left the restaurant to continue their investigation, but later returned and were able to reach Lil by telephone. Jordan told Lil he wanted to question Smith. Lil gave him Smith's new address, 629 West Meinecke Street.

Jordan then called the police station to contact another squad that was also investigating the battery and to obtain a backup squad. Jordan had a description of Smith. At that point, Smith was a murder suspect.

The five officers arrived at the Meinecke Street address at about 8:55 p.m. They spoke to several people downstairs, who recognized the description of Smith and told them where he lived. The officers' plan was to ar-

rest Smith for battery. Prior to entering Smith's apartment, Jordan banged on the door and yelled loudly but received no response. The door was ajar and they heard someone snoring within. Jordan, with his service revolver drawn, opened the door and entered. From the description he had, Jordan recognized Smith asleep on the bed in another room. Believing he had probable cause to arrest Smith, he handcuffed and arrested him.

At 6:00 p.m. that same day, Jordan had not thought that he could obtain an arrest warrant until the following morning. He did not know that Smith was at the Meinecke Street address until he got there. He did not apply for a warrant because he believed he had probable cause. When he arrived at the Meinecke Street address, he believed that the apartment would contain some evidence relating to the battery charge, *i.e.*, bloody clothes from both the battery and the murder. He believed Smith was at that address because of the information he received from Lil and the people downstairs. He believed that if he attempted to obtain a search and arrest warrant, Smith would not be there when he returned. He based his belief partly on the fact that Smith was not at the first two addresses that he had obtained. The reason for having four squads at the arrest scene was the connection between the battery and the murder.

"[W]here the historical facts are undisputed, as here, the existence of exigent circumstances which justify a warrantless arrest is a question of law which is subject to independent appellate review, without deference to the trial court's conclusion." *State v. Drogsvold*, 104 Wis. 2d 247, 267, 311 N.W.2d 243, 250 (Ct. App. 1981). In light of the uncontroverted evidence detailed above, the obvious connection of the battery with the murder, and the risks of danger to the public and flight of the suspect, we conclude that sufficient exigent circumstances existed to justify the warrantless entry and arrest. We also con-

clude that since the arrest was not illegal, the evidence obtained incident thereto was not tainted and therefore was not required to be suppressed.

## IV.  INSTRUCTION ON INCOMPETENT WITNESS

Smith next contends that the trial court erred by instructing the jury that a defense witness was unavailable because he was mentally ill and that the court would therefore admit the witness's extrajudicial statements under an exception to the hearsay rule. We hold that the trial court did not misuse its discretion by so instructing the jury.

Smith desired to call Shelby Savage to testify about statements Savage had made while he was Smith's jailmate. The statements inculpated Savage and exculpated Smith as Lows' murderer. A hearing was conducted outside the presence of the jury to determine what exactly Savage would say and whether he would exercise his right to silence. Savage's responses to questions led both his court-appointed attorney and the district attorney to question his competency as a witness.

The trial court found that although Savage was probably unreasonable in refusing to answer defense counsel's questions, it appeared that a threat of contempt would be unavailing. It further found that Savage's testimony would probably be no more than a rambling refusal to testify and that he might prejudice the state by exercising his right to remain silent. The trial court expressed doubt as to Savage's competency to testify. It found that Savage did not understand his fifth amendment rights and declared him unavailable under sec. 908.04(1)(d), Stats.[5]  The trial court allowed Smith to

---

[5] Section 908.04(1), Stats., provides in part:

"Unavailablity as a witness" includes situations in which the declarant:

introduce the testimony of two other witnesses, a criminal investigator and another jailmate of Smith's, as to what they had heard Savage say. Before allowing such testimony, however, the trial court advised the jury that Savage would not be testifying because it had determined that he was "mentally ill."

Smith does not argue that the trial court misused its discretion in refusing to allow Savage to testify. Rather, he challenges the theory on which the trial court relied to declare Savage unavailable. Smith argues it was unnecessary to rule Savage incompetent to testify on the basis of mental illness, because Savage was obviously invoking his right to remain silent. Smith argues that Savage's extrajudicial statements would still have been admissible under a theory that Savage was unavailable due to the exercise of his fifth amendment rights. We are not persuaded.

First, because Savage's statements were self-incriminating and were offered to exculpate Smith, sec. 908.045 (4), Stats., required that they be corroborated in order to be admissible. *See Ryan v. State,* 95 Wis. 2d 83, 95–96, 289 N.W.2d 349, 354–55 (Ct. App. 1980). No corroborating evidence was presented. Further, the record reflects the presence of but a few of the factors noted in *Chambers v. Mississippi,* 410 U.S. 284, 300–01 (1972), as being "assurances of trustworthiness" that support admission of hearsay evidence otherwise inadmissible under state evidentiary rules. Although not asked to do so, we conclude that the trial court could justifiably have excluded the testimony of the investigator and the jailmate relating to Savage's inculpatory statements.

. . . .
    (d) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity;
. . . .

128

Section 906.01, Stats., provides that "[e]very person is competent to be a witness," thereby repealing the predecessor competency standard statute and prior case law. Nevertheless, a trial judge still has the broad discretion to control the course of a trial and to rule on the witnesses' personal knowledge and on the relevancy of the testimony. 3 J. Weinstein & M. Berger, *Weinstein's Evidence* par. 601[01] (1982). *See* secs. 904.01 to 904.03, Stats. In reflecting on the new approach, Weinstein and Berger observe:

> If competency is defined as the minimum standard of credibility necessary to permit any reasonable man to put any credence in a witness's testimony, then a witness must be competent as to the matter to testify about; it is the court's obligation to insure that he meets that minimum standard. In making this determination the court will still be deciding competency. It would, however, in view of the way the rule is cast, probably be more accurate to say that the court will decide not competency but *minimum credibility*. This requirement . . . is just one aspect of the requirement of minimum probative force— i.e., relevancy. Regardless of terminology, the trial judge may exclude all or a part of the witness' [sic] testimony on the ground that no one could reasonably believe the witness could have observed, remembered, communicated or told the truth with respect to the event in question. He may use the voir dire to make this determination. [Emphasis added, footnotes omitted.]

*Id.* at 601–9 through 601–10. We accept this analysis as the basis for excluding the testimony of certain witnesses when appropriate and deem it applicable to the facts before us.

The nature of the proffered testimony of Savage cannot be ignored. At the hearing held to determine how he would testify, he was rambling, discordant, nonresponsive and combative. It is little wonder that the trial court, in the exercise of its inherent power to determine

minimum credibility and probative force, decided to exclude him as a witness.

The trial court was deeply concerned about arriving at the truth and about the significance of Savage's statements. It weighed the competing interests and decided to allow the investigator and the fellow inmate to testify to Savage's statements, but only after it informed the jury why it was allowing such testimony. We cannot conclude that there was no reasonable basis for the trial court's decision. The trial court did not misuse its discretion in instructing the jury as it did.

## V.  PRESERVATION OF EVIDENCE

Smith asserts a new trial should be granted because of the state's nondisclosure of evidence. He argues that the state failed in its responsibility to fully investigate, examine, and analyze the entire murder scene and many of the items found therein. Specifically, Smith complains of the state's failure to confiscate two kitchen knives, a vase, and a pair of eyeglasses, and its failure to dust for fingerprints on two drawers and a coffee table. He argues that since the state had total control over the crime scene, it had a duty to fully investigate, maintain, and produce all available evidence. The items sought are no longer available. Smith contends that he is foreclosed from obtaining exculpatory evidence if, in fact, any existed.

This entire argument is cloaked in speculation. The record shows that all items from which prints could be lifted were dusted for that purpose. Only two fingerprints, both belonging to the victim, were found. No blood appeared on the two kitchen knives. The record contains no request from Smith that the state dust or perform other tests on any other items. There is nothing to

suggest that exculpatory evidence actually existed which was overlooked by the state.

It is not suggested that this case involves the destruction of evidence, the failure to turn over evidence, or an inadvertent loss of evidence. Rather, it involves the failure to gather evidence. Smith cites *Wold v. State*, 57 Wis. 2d 344, 349, 204 N.W.2d 482, 486 (1973), for the proposition that the prosecutor has "the duty to acquire all relevant evidence." *Wold* is inapposite here since it expressly limits the duty to acquire to "all evidence in the possession of investigative agencies of the state." *Id.* The basis for Smith's claim of error is that the "investigative agencies of the state" never took possession of the evidence. We decline to hold that a defendant's right to due process includes a requirement that the state collect all evidence which might possibly turn out to be exculpatory.

## VI. INTEREST OF JUSTICE

Lastly, Smith contends he is entitled to a new trial in the interest of justice. He claims a miscarriage of justice has occurred because of the cumulative effect that the alleged errors had on the fairness of the trial. We disagree.

A new trial based on a miscarriage of justice will only be granted with some reluctance and great caution. *Rogers v. State*, 93 Wis. 2d 682, 694, 287 N.W.2d 774, 779 (1980). A new trial will not be granted in the interest of justice unless we can reasonably conclude that a new trial under optimum circumstances would result in a verdict of acquittal. *Hoppe v. State*, 74 Wis. 2d 107, 122, 246 N.W.2d 122, 131 (1976). In view of our disposition of the issues Smith raises, we perceive no basis in the record for a new trial in the interest of justice.

*By the Court.*—Orders affirmed.