COURT OF APPEALS
DECISION
DATED AND FILED

March 16, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP330-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF1435

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KEVIN M. LOCKHART,

DEFENDANT-APPELLANT.

APPEAL from judgments and an order of the circuit court for Dane County: JILL KAROFSKY and CHRIS TAYLOR, Judges. *Affirmed*.

Before Blanchard, P.J., Kloppenburg, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Kevin Lockhart appeals his judgments of conviction and the circuit court's order denying his motion for postconviction relief.[1]  Lockhart contends that his trial counsel was ineffective for failing to file a motion to dismiss criminal charges or to suppress evidence as a sanction for the State's failure to preserve exculpatory evidence.  We conclude that counsel did not perform deficiently by failing to file such a motion because the motion would not have been successful or would have required the resolution of unsettled law.  We therefore affirm the judgments of conviction and the order denying Lockhart's motion for postconviction relief.

## BACKGROUND

¶2    The State charged Lockhart with attempted armed robbery, possession of a firearm by a felon, misdemeanor bail jumping, resisting an officer, two counts of disorderly conduct, felony bail jumping, and two counts of intimidating a victim, all as repeat offenses.  Lockhart denied the allegations and the case proceeded to a jury trial.  The following summary of facts is derived from the testimony and exhibits introduced during the trial.

¶3    On July 12, 2018, A.B. and C.D. were sitting in A.B.'s car, which was parked in the parking lot of their friend E.F.'s apartment complex.[2]  Lockhart drove by and spotted A.B., who owed him money.  Lockhart pulled into the

---

[1] The Honorable Jill Karofsky presided over the trial and entered the judgments of conviction.  The Honorable Chris Taylor presided over the postconviction proceeding and entered the order denying Lockhart's postconviction motion.

[2] To protect their privacy, we refer to the victims and witnesses using initials that do not correspond with their own.  *See* WIS. STAT. RULE 809.86(4) (2021-22).  All references to the Wisconsin Statutes are to the 2021-22 version.

parking lot, got out of his vehicle, and demanded money from A.B.  A.B. responded that he did not have the money.  According to the trial testimony of A.B. and C.D., Lockhart returned to his vehicle, loaded a clip into a handgun, and returned to A.B.'s car.  Trial testimony varied about whether Lockhart cocked the gun and perhaps pointed it at A.B. or whether he left the gun in his pocket.[3]

¶4    Lockhart again demanded that A.B. repay him and said that if A.B. did not, Lockhart would take A.B.'s car.  A.B. got out of the car, Lockhart followed, and a struggle ensued during which A.B.'s keys fell onto the ground. Lockhart picked up the keys, and A.B. left the scene to call 9-1-1.  During the 9-1-1 call, A.B. stated that a man wearing a blue jogging suit pulled a 9-mm handgun on him and took his car keys and money.

¶5    A police officer was dispatched to the scene and observed a man wearing a blue jogging suit, later identified as Lockhart, standing beside A.B.'s car.  Lockhart fled into the apartment complex, despite the officer's commands to stop.  Video surveillance footage obtained from the complex showed Lockhart leaving the complex wearing different clothing than he had been wearing when he entered.  Lockhart surrendered to law enforcement and was arrested shortly thereafter.  Law enforcement searched apartments in the complex and discovered a

---

[3] A.B. testified that Lockhart cocked the gun, but C.D. said that the gun remained in Lockhart's pocket, partially exposed.  E.F. testified that the gun was partially exposed in Lockhart's pocket, that Lockhart was reaching for it, "and then pull[ed] it out.  It was like a black handle or something.  Then he put it back …."  However, E.F. initially told police he did not see a gun at all.

9-mm black handgun and clothing matching the description that A.B. had provided in the 9-1-1 call.[4]

¶6    Later that day, A.B. was approached by Lockhart's girlfriend. She was on the phone with Lockhart, who had called from jail, and she handed the phone to A.B. This phone call was recorded, the audio recording was played for the jury at the trial, and a transcript was entered as evidence.

¶7    During the call, Lockhart told A.B. that his girlfriend would drive A.B. to the police station so he could "go in there and tell … the truth." Lockhart told A.B. to say that he "lied" about his interaction with Lockhart because he "was upset," he "was all high, or whatever," that they "just had a little misunderstanding" and that nothing really happened. A.B. agreed to go to the police station and make a statement. Lockhart told A.B. that his girlfriend would go into the station with him.

¶8    According to his trial testimony, A.B. entered the police station, approached an officer, and informed the officer that he wished to retract his statements from earlier that day. The officer told A.B. "it was too late," that the matter "was in the [district attorney]'s hands," that "I can't retract it from them," and that "I would have to take that up with the [district attorney]."[5] A.B. testified

---

[4] The six charges in the original complaint—attempted armed robbery in violation of WIS. STAT. § 943.32(2); possession of a firearm by a felon in violation of WIS. STAT. § 941.29(1m); misdemeanor bail jumping in violation of WIS. STAT. § 946.49(1); resisting an officer in violation of WIS. STAT. § 946.41(1); and two counts of disorderly conduct while using a dangerous weapon in violation of WIS. STAT. § 947.01 and WIS. STAT. § 939.63—were all based on the above-described sequence of events on July 12, 2018.

[5] We observe that this testimony from A.B., and specifically A.B.'s use of the pronoun "I," is somewhat ambiguous. It is not clear from the transcript whether A.B. was saying that "I, the officer," or "I, A.B.," would have to take it up with the district attorney. However, during the *Machner* hearing, the circuit court found that A.B. was referring to himself and that the officer

(continued)

4

that he went to the police station because he had considered recanting, but that A.B. later changed his mind because "reality kicked in," and he realized that when Lockhart "cocked that gun, the gun could have went off" and A.B. "[w]ouldn't be here today."

¶9     Following the events of July 12, 2018, Lockhart continued to contact A.B. and, on several occasions, Lockhart attempted to persuade A.B. to provide different information to the police or to refuse to cooperate with the prosecution.[6] A.B. testified that these contacts made him nervous, that he felt that he needed to "watch [his] back," that he wanted Lockhart to think that he was not cooperating with the prosecution, and that on one such occasion, A.B. came to the courthouse "to make [Lockhart] think [he was] coming to recant," but that A.B. left without saying anything.

¶10     At trial, the State attempted to establish the elements of attempted robbery, possession of a handgun, and disorderly conduct with a dangerous weapon through the surveillance footage, the gun found in the apartment, and the testimony of witnesses including A.B., C.D., and E.F.  Lockhart's trial counsel conceded to the jury that Lockhart had acted "disorderly" towards A.B. on July 12, 2018, and that he had resisted an officer.  However, trial counsel argued that the State had not proven that Lockhart possessed a weapon that day, that Lockhart had

---

directed A.B. to the district attorney, and neither party challenges this interpretation on appeal. *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (1979).

[6] Lockhart was also alleged to have attempted to persuade C.D. to provide different information to the police or to refuse to cooperate with the prosecution.  Based on Lockhart's post-charging conduct toward A.B. and C.D., the State amended the information, adding two counts of victim intimidation in violation of WIS. STAT. §§ 940.44 and 940.45 and one count of felony bail jumping in violation of WIS. STAT. § 946.49(1).

attempted to rob A.B., or that Lockhart had intimidated A.B. and C.D. Lockhart's defense to those charges centered on attacking the credibility of A.B., C.D., and E.F., and emphasizing the absence of "hard evidence."

¶11    In attacking A.B.'s credibility, trial counsel highlighted the fact that A.B. had gone to the police station, and attempted to recant his initial statements to police. Counsel characterized Lockhart's request that A.B. make a statement as "encouragement … to go down and tell the truth," and she reminded the jury that the on-duty officer "refuse[d] to take the statement." Counsel argued that A.B. changed his mind about recanting after he learned that he might face criminal penalties for doing so. Counsel argued that A.B. had "a choice of … maintaining that statement that he originally gave and getting to sit in this chair as a witness, or … of changing his statement and potentially ending up in this chair as a defendant[,]" and she remarked that "regardless of what happened," she had "no doubt as to why" A.B. ultimately decided not to recant.

¶12    The jury returned guilty verdicts on seven of the nine counts: attempted armed robbery, possession of a firearm by a felon, misdemeanor bail jumping, resisting an officer, two counts of disorderly conduct, and the count of victim intimidation related to A.B. It returned not guilty verdicts on the victim intimidation charge related to C.D. and on the felony bail jumping charge.

¶13    Postconviction, Lockhart filed a motion to vacate his convictions on the ground of ineffective assistance of counsel, and to grant a new trial. Lockhart argued that trial counsel had been ineffective for failing to file a pretrial motion to dismiss the charges based on the State's failure to preserve evidence related to A.B.'s attempted recantation. Lockhart argued that this evidence possessed an exculpatory value that should have been apparent to the officer who interacted

with A.B., and that Lockhart was unable to obtain comparable evidence by other reasonably available means.[7]

¶14    The circuit court held a *Machner* hearing, at which trial counsel was the sole witness. *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (1979). She testified that she did not "have any specific or strategic reason" for not filing a pre-trial motion regarding the State's failure to preserve A.B.'s attempted recantation. Counsel testified that "it never occurred to [her] to file such a motion," and she declined to "speculate" whether such a motion would have had merit. She testified that her trial strategy related to A.B.'s recantation attempt was to cross-examine A.B. about going to the police station with "the intent to recant," and to attack the credibility of A.B.'s allegations.

¶15    The circuit court denied Lockhart's motion in an oral ruling. The court first found that trial counsel did not consider making a motion to dismiss charges or suppress evidence, and that she accordingly had no strategic reason for not doing so. The court then considered whether the motion would have had merit, had it been filed.

¶16    In deciding whether the State violated Lockhart's due process rights by failing to preserve A.B.'s attempted recantation, the circuit court considered whether the unpreserved evidence was apparently or potentially exculpatory. It

---

[7] Although Lockhart's postconviction motion suggests that the State's failure to preserve the evidence in question would have been material to each of the seven charges for which Lockhart was convicted, this assumption does not appear to be well founded. To the extent that A.B. provided a different account of Lockhart's actions on July 12, 2018, that account could have been material to the attempted armed robbery, possession of a firearm by a felon, misdemeanor bail jumping, and disorderly conduct charges. However, Lockhart does not explain how A.B.'s hypothetical statement would be material to the charge of intimidating a victim or the charge of resisting an officer.

appeared to determine that the recantation attempt possessed an exculpatory value that was apparent to the State. However, it concluded that Lockhart's due process rights were not violated because evidence of the fact that A.B. attempted to recant was presented at trial.

¶17 Finally, the circuit court determined that the record at the *Machner* hearing was devoid of any evidence that the officer failed to preserve the evidence in bad faith. According to the court, there was no evidence of "intentional destruction or … concealment" but rather "some laziness and maybe a little negligence [in] not … taking that statement and directing [A.B.] instead to the District Attorney."

¶18 The circuit court issued an order denying the postconviction motion. Lockhart appeals.

## DISCUSSION

¶19 On appeal, Lockhart contends that he was denied the effective assistance of counsel guaranteed by the state and federal constitutions.[8] "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly

---

[8] "Under the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel." *State v. Lemberger*, 2017 WI 39, ¶16, 374 Wis. 2d 617, 893 N.W.2d 232 (citation omitted). "The same right is guaranteed under Article I, Section 7 of the Wisconsin Constitution." *State v. Brietzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93.

erroneous[.]" *Id.* "[W]hether counsel's conduct constitutes ineffective assistance is a question of law, which we review de novo." *Id.*

¶20 To demonstrate that counsel's assistance was ineffective, Lockhart must establish that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance "is constitutionally deficient if it falls below an objective standard of reasonableness." *State v. Thiel*, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305; *Breitzman*, 378 Wis. 2d 431, ¶38. To demonstrate prejudice, Lockhart must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. We proceed to address whether trial counsel performed deficiently, and because we conclude that she did not, we do not address whether Lockhart was prejudiced. *See id.* at 697 (if a defendant fails to satisfy either prong, we need not consider the other).

¶21 Lockhart argues that trial counsel performed deficiently because she failed to seek dismissal of the charges against him, or suppression of the State's most probative evidence, on the basis that the State's failure to preserve exculpatory evidence violated Lockhart's due process rights. To determine whether counsel's performance was deficient for failing to bring a motion, we assess the merits of the motion. *See State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16. "Counsel does not perform deficiently by failing to bring a meritless motion," *id.*, or by failing to raise issues that require the resolution of unsettled law. *See Breitzman*, 378 Wis. 2d 431, ¶49 ("[F]ailure to raise arguments that require the resolution of unsettled legal questions generally does not render a lawyer's services 'outside the wide range of professionally

9

competent assistance' sufficient to satisfy the Sixth Amendment." (citation omitted)).

¶22    We begin by setting forth applicable due process law regarding the State's duty to disclose, preserve, and collect exculpatory evidence. We then apply these legal principles to Lockhart's arguments.

### I. The State's Due Process Duty to Disclose, Preserve, and Collect Evidence

¶23    The due process clauses of the state and federal constitutions require the State to disclose material exculpatory evidence in its possession to afford criminal defendants a meaningful opportunity to present a defense. ***State v. Wayerski***, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468 ("A defendant has a due process right to any favorable evidence 'material either to guilt or to punishment' that is in the State's possession." (quoting ***Brady v. Maryland***, 373 U.S. 83, 87 (1963)). The duty to disclose exculpatory evidence is not directly relevant to this appeal, because Lockhart is not arguing that the State failed to disclose any evidence in its possession.

¶24    Lockhart's appeal instead turns on related due process principles regarding the State's duty to preserve certain evidence that is or could turn out to be exculpatory. ***Illinois v. Fischer***, 540 U.S. 544 (2004) (addressing the government's duty to preserve evidence); ***Arizona v. Youngblood***, 488 U.S. 51 (1988) (same); ***California v. Trombetta***, 467 U.S. 479 (1984) (same). When the State has a duty to preserve evidence, it fails in that duty whether it "affirmatively destroy[s] evidence or passively allow[s] it to be destroyed." ***State v. Huggett***, 2010 WI App 69, ¶20, 324 Wis. 2d 786, 783 N.W.2d 675. "When evidence has been destroyed in violation of the Constitution, the court must choose between

barring further prosecution or suppressing … the State's most probative evidence." *State v. Hahn*, 132 Wis. 2d 351, 361, 392 N.W.2d 464 (Ct. App. 1986) (quoting *Trombetta*, 467 U.S. at 487).

¶25 The State's failure to preserve evidence violates a defendant's due process rights if the State failed to preserve evidence that is apparently exculpatory, or failed to preserve evidence that is potentially exculpatory in bad faith. *State v. Greenwold*, 181 Wis. 2d 881, 885, 512 N.W.2d 237 (Ct. App. 1994) (*Greenwold I*); *State v. Greenwold*, 189 Wis. 2d 59, 67-68, 525 N.W.2d 294 (Ct. App. 1994) (*Greenwold II*). Thus, a fundamental question is whether the unpreserved evidence was apparently or potentially exculpatory. In deciding whether lost or destroyed evidence is apparently or potentially exculpatory, "[w]e are to assess the constitutional materiality of the evidence in question at the time of its destruction." *State v. Weissinger*, 2014 WI App 73, ¶15 n.6, 355 Wis. 2d 546, 851 N.W.2d 780, *aff'd sub. nom.*, *State v. Luedtke*, 2015 WI 42, 362 Wis. 2d 1, 863 N.W.2d 592 (citing *Trombetta*, 467 U.S. at 489).

¶26 Evidence is "apparently exculpatory" if it "possess[es] an exculpatory value that was apparent [to the State] before the evidence was destroyed." *Hahn*, 132 Wis. 2d at 356 (quoting *Trombetta*, 467 U.S. at 488-89). The State's failure to preserve apparently exculpatory evidence violates a defendant's due process rights if the unpreserved evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Huggett*, 324 Wis. 2d 786, ¶21 (citation omitted). In cases in which "the materiality of the evidence rises above being potentially useful to clearly exculpatory," the defendant need not show bad faith. *Greenwold II*, 189 Wis. 2d at 67-68.

11

¶27  In contrast, evidence that does not possess an apparently exculpatory value prior to it being lost or destroyed, and instead is only potentially useful, is "potentially exculpatory."  *See id.* at 67; *see also* **Greenwold I**, 181 Wis. 2d at 885. Our cases have often characterized untested forensic evidence as potentially exculpatory.  *See* **State v. Oinas**, 125 Wis. 2d 487, 373 N.W.2d 463 (Ct. App. 1985) (fingerprints left on a wallet found at the crime scene); **State v. Smith**, 125 Wis. 2d 111, 370 N.W.2d 827 (Ct. App. 1985), *rev'd on other grounds*, 131 Wis. 2d 220, 388 N.W.2d 601 (1985) (miscellaneous items in a home that may have contained forensic evidence); **Greenwold I**, 181 Wis. 2d 881 (untested blood spots in a vehicle's interior); **Luedtke**, 362 Wis. 2d 1 (blood samples taken during OWI investigations).  In these cases, the exculpatory value of the evidence was unknown to the State prior to it being lost or destroyed, and "no more [could] be said [of the evidence] than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *See* **Greenwold I**, 181 Wis. 2d at 885-86 ("this evidence was simply an avenue of investigation that might have led in any number of directions" (quoting **Youngblood**, 488 U.S. at 56 n.*)).  The State's failure to preserve potentially exculpatory evidence violates due process only if the State fails to preserve the evidence in bad faith.  **Greenwold II**, 189 Wis. 2d at 67.

¶28  Before turning to Lockhart's arguments, we briefly comment on the few federal and state cases that discuss whether the State has a duty to collect exculpatory evidence, or to generate it in the first instance.  In contrast to the law regarding the duty to disclose and preserve evidence, discussed above, the law is far less settled on the State's obligation to collect or generate evidence.  The

United States Supreme Court has never directly addressed this issue,[9] and federal circuit court cases appear to point in different directions.[10]  No Wisconsin case has explicitly recognized a duty on the part of the State to collect or generate exculpatory evidence, and two published Wisconsin cases appear to acknowledge a distinction between *preserving* evidence on the one hand, and *collecting* evidence on the other.  *See Smith*, 125 Wis. 2d at 130 (declining to conclude that "a defendant's right to due process includes a requirement that the state collect all evidence which might possibly turn out to be exculpatory"); *Greenwold II*, 189 Wis. 2d at 69-70 (stating that "failure to collect potentially exculpatory evidence is not a violation of due process rights," but then lumping together the officers' failure to gather certain evidence at the crime scene with their failure to preserve the blood specimens, and analyzing both in terms of whether the officers acted in bad faith).

---

[9] *See, e.g.*, ***Arizona v. Youngblood***, 488 U.S. 51, 58-59 (1988) (stating in passing that the Court is unwilling to read the due process clause to "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution," and that "the police do not have a constitutional duty to perform any particular tests").

[10] *See **Commonwealth of N. Mariana Islands v. Bowie***, 243 F.3d 1109, 1117 (9th Cir. 2001) ("[D]ue process requires law enforcement not just to preserve evidence already in hand, but to gather and to collect evidence in 'those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant'" (citation omitted)); ***Miller v. Vasquez***, 868 F.2d 1116, 1120 (9th Cir. 1989) ("A police officer's failure to preserve or collect potentially exculpatory evidence does not violate due process unless the officer acted in bad-faith."); ***United States v. Brimage***, 115 F.3d 73, 76 (1st Cir. 1997) (noting that law enforcement's decision to not record a conversation is categorically different from the failure of police to maintain the breath samples of a drunk driving defendant, or the failure to preserve semen samples in a sexual assault case); ***Bullock v. Carver***, 297 F.3d 1036, 1056 n.9 (10th Cir. 2002) (noting that ***Trombetta*** and ***Youngblood*** may apply when police fail to preserve interview notes or recordings, but that it is unclear whether that framework applies when the police fail to take notes or record an interview in the first instance).

## II. Lockhart's Arguments

¶29 With this legal framework in mind, we turn to Lockhart's arguments. Lockhart contends that the State violated his due process rights by failing to preserve: (1) evidence of the fact that A.B. went to the police station with Lockhart's girlfriend and told an officer that he wanted to recant his earlier statement; and (2) the contents of any recantation A.B. would have given, had the officer taken a statement from him that day. Whether state action violates due process presents a legal question, which we decide independently. *Luedtke*, 362 Wis. 2d 1, ¶37. However, "we accept the [circuit] court's findings of historical fact unless clearly erroneous." *Wayerski*, 385 Wis. 2d 344, ¶35. We address Lockhart's arguments in turn.

## A. Evidence of A.B.'s Recantation Attempt

¶30 We begin with Lockhart's arguments concerning A.B.'s recantation attempt. Lockhart argues that the fact that A.B. went to the police station with Lockhart's girlfriend and told the officer that he wanted to recant is apparently exculpatory evidence, and we agree. However, as discussed above, counsel is not ineffective for failing to file a motion that would have been denied, or that would have required the resolution of unsettled law. *Sanders*, 381 Wis. 2d 522, ¶29; *Breitzman*, 378 Wis. 2d 431, ¶49. For reasons we now explain, we conclude that, had trial counsel made a motion premised on the State's failure to preserve evidence of the fact that A.B. attempted to recant, the motion would have been denied.

¶31 Lockhart's argument about the topic fails because Lockhart has not identified any evidence of A.B.'s recantation attempt that the State lost or destroyed. As we understand it, all of the existing evidence of A.B.'s recantation

attempt was preserved and presented at trial. Specifically, the State played the recorded jail call in which Lockhart encouraged A.B. to recant, and during which A.B. indicated that he would go to the police station to recant. And A.B. testified that he went to the station with Lockhart's girlfriend, told an officer that he wanted to recant, and was turned away. Trial counsel cross-examined A.B. extensively about his recantation attempt and, during closing argument, she argued that it undermined the credibility of A.B.'s trial testimony. Accordingly, any motion to dismiss charges or suppress evidence based on the State's failure to preserve evidence of the recantation attempt would have been denied.

¶32 Alternatively, Lockhart may be arguing that the State had a duty to generate a police report documenting the fact that A.B. expressed an intent to recant, and that the existing evidence—the audio recording of the jail call and A.B.'s testimony—was less favorable to Lockhart's defense than a police report recording the same events would have been. However, to the extent that Lockhart is arguing that counsel was ineffective for failing to make a motion on that basis, any such argument would likewise fail. Although the State's duty to preserve existing evidence is well established, Lockhart points to no federal or Wisconsin case that has imposed a duty upon the State to create or generate evidence, let alone the best or most favorable form of the evidence. *See, e.g.*, *Youngblood*, 488 U.S. at 58-59 (expressing unwillingness to impose a duty on the State to perform any particular tests); *Breitzman*, 378 Wis. 2d 431, ¶49 (counsel does not perform deficiently by failing to raise arguments that require the resolution of unsettled law).

**B. Evidence of the Content of the
Statement A.B. Would Have Given**

¶33    We turn to what we perceive to be the heart of Lockhart's appeal—his argument that the State violated due process when the officer failed to take a statement from A.B. after he arrived at the police station and told the officer he wanted to recant.  Lockhart contends that A.B.'s statement would have been apparently exculpatory, and that, had the officer taken the statement and memorialized it in some manner, Lockhart could have used the "evidence of this alternative narrative" to better impeach A.B. at trial.  Lockhart argues that he was unable to obtain any comparable evidence of the statement A.B. would have made because A.B. changed his mind about recanting and, therefore, what he would have said that day is irretrievably lost.

¶34    We assume for the sake of argument that the State's failure to take and memorialize a statement from A.B. can be characterized as a failure to preserve evidence, but, as we have explained, this is no small assumption in Lockhart's favor.  *See supra* ¶28 & nn.9, 10.  Even with that assumption, we conclude that Lockhart's due process claim would not have succeeded because the content of any statement that A.B. would have given is only potentially exculpatory, and Lockhart has not proven that the State failed to take A.B.'s statement in bad faith.

¶35    It is certainly true that whatever A.B. would have said is irretrievably lost.  But it is equally true that the record does not reflect what A.B. would have said.  Lockhart argues that the content of a victim's nearly contemporaneous recantation is apparently exculpatory evidence, and we agree with this general proposition.  However, Lockhart fails to show any likelihood that, had the officer taken A.B.'s statement, A.B. actually would have recanted his

prior statements to police or provided any other information that was useful to Lockhart's defense. Much like untested forensic evidence, the contents of the statement A.B. would have made is entirely unknown. *See supra* ¶27.

¶36 Lockhart concedes that he does not know exactly what A.B. would have said if he had given a statement, but he argues that we may infer its likely contents based on the circumstances established by available evidence. More specifically, he argues that, based on A.B.'s trial testimony and the recorded jail phone call in which Lockhart directed A.B. what to say when making his statement to the police, we may infer that A.B. would have retracted the incriminating account that he had provided earlier that day, and that he might have provided a counter-narrative to his earlier statements to police, replete with details contradicting the earlier account.

¶37 The inferences that Lockhart asks us to make are too speculative. Although A.B. might have given a detailed counter-narrative that would have been helpful to Lockhart's defense, it appears to be equally likely that A.B. would not have provided any such statement, or even that he would have provided additional inculpatory information to the officer that would have been harmful to Lockhart's defense. As mentioned above, A.B. later testified that Lockhart's attempts to pressure him to recant made him nervous, and that he wanted Lockhart to believe that he was not cooperating with the prosecution. Presumably, had the officer taken A.B.'s statement, the officer would not have done so in the presence of Lockhart's girlfriend. If so, after A.B. was separated from Lockhart's girlfriend at the police station, A.B. might have decided against recanting, and he might have even disclosed that Lockhart was pressuring him into recanting. Alternatively or in addition, the officer might have informed A.B. of the potential penalties for

providing false information to the police, and A.B. might have decided to stick with the original narrative that he had provided to the police earlier that day.

¶38    We acknowledge that all of the above scenarios are based on speculation, but that is the point—A.B. did not give a statement to the officer at the station that day, and we lack a basis to determine what A.B. would have said, had his statement been taken.  We therefore conclude that the content of the statement A.B. would have made, if any, is not apparently exculpatory.  It is potentially exculpatory, and to succeed on a motion to dismiss charges or suppress evidence, Lockhart would have had to demonstrate that the State failed to preserve A.B.'s statement in bad faith.  *See* **Greenwold II**, 189 Wis. 2d at 67 (defendant carries the burden of proving bad faith).

¶39    "[B]ad faith can only be shown if:  (1) the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve; *and* (2) the officers acted with official animus or made a conscious effort to suppress exculpatory evidence."  **Greenwold II**, 189 Wis. 2d at 69.  On this point, as the circuit court observed, the record is sparse.  Lockhart argued that it was bad faith for the officer to turn A.B. away without taking his statement, but Lockhart did not attempt to introduce testimony from that officer at the **Machner** hearing, nor did he introduce the testimony of any other witness with knowledge of the facts known to the officer at the time A.B. came to the station, or knowledge of the officer's reasons for turning A.B. away.  The only facts in the record come from A.B.'s trial testimony on this point, which was limited to the following:

> [A.B.:]  We went to the north side police station, and one officer in there said it was too late; it was in the DA's hand.
>
> [The prosecutor:]  Who was "we"?  Who went with you to the north station?

18

[A.B.:] Me and [Lockhart's] girlfriend and [C.D.]

[The prosecutor:] And you said you went to the north station and you met with an officer?

[A.B.:] Yes.

[The prosecutor:] And they said it was too late?

[A.B.:] He was, like, it's in the DA's hand; I can't retract it from them; I would have to take that up with the DA.

¶40    Lockhart argues that this testimony from A.B. is by itself sufficient to show bad faith.  We assume without deciding that this testimony is sufficient to show that the officer was aware of the potentially exculpatory value of any statement A.B. might have made, and that it satisfies the first prong of the test for bad faith.  *See Greenwold II*, 189 Wis. 2d at 69.  However, we agree with the circuit court that it falls far short of satisfying Lockhart's burden to prove that the officer "acted with official animus or made a conscious effort to suppress exculpatory evidence." *Id.*

¶41    Lockhart argues that the officer's statement to A.B.—that it was too late in the process for the officer to take down A.B.'s recantation—was false. Lockhart contends that is was not "too late" for the officer to collect a statement, as evinced by the fact that A.B. met with law enforcement on later occasions to provide evidence about Lockhart's alleged intimidation, and to prepare for later court proceedings.  Lockhart distinguishes the officer's actions in this case from several federal cases finding no bad faith where law enforcement negligently failed to preserve evidence.  *See Montgomery v. Greer*, 956 F.2d 677, 681 (7th Cir. 1992) (losing evidence), *United States v. Sanders*, 954 F.2d 227, 231 (4th Cir. 1992) (accidentally erasing video).  Lockhart argues that, in this case, the officer made a conscious and deliberate choice to not take A.B.'s statement, and based on that choice, we can infer bad faith.

19

¶42 We conclude that the facts in the record do not rise to the level of bad faith. Based on A.B.'s testimony, the officer did not tell A.B. it was too late to provide information relevant to the case—rather, the circuit court found that the officer stated it was too late for him, the officer, to take A.B.'s statement, and he instead directed A.B. to speak with the district attorney's office. The officer's affirmative representation had the effect of turning A.B. away, but Lockhart presented no evidence about why the officer made that representation, and there is also no evidence suggesting that the officer or anyone else took any action to impede A.B. from providing additional information to the district attorney. On this record, Lockhart has not carried his burden of proving bad faith.

¶43 In sum, assuming that the officer's failure to take A.B.'s statement can be characterized as a failure to preserve evidence, A.B.'s statement is potentially exculpatory, and Lockhart has not shown bad faith. Thus, any pretrial motion to dismiss the charges against Lockhart or to suppress the State's most probative evidence as a remedy for the State's failure to preserve the content of A.B.'s statement would not have succeeded, and counsel was not deficient for failing to file such a motion. *See Sanders*, 381 Wis. 2d 522, ¶29 (counsel does not perform deficiently by failing to file meritless motions).

## CONCLUSION

¶44 For the foregoing reasons, we affirm the judgments of conviction and the circuit court order denying Lockhart's motion for postconviction relief.

*By the Court.*—Judgments and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.